**CROSS PETROLEUM, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 97–251C.**

United States Court of Federal Claims.

Oct. 31, 2002.

Walter P. McNeill, Redding, CA, for plaintiff.

Michael F. Kiely, Washington, DC, with whom was Assistant Attorney General Robert D. McCallum, Jr., for defendant. Rose Miksovsky and James Andrews, Office of the General Counsel, United States Department of Agriculture, San Francisco, CA, of counsel.

## OPINION

MILLER, Judge.

After trial on the validity of a default termination, this case comes before the court for decision. The Government attempts to sustain the termination based on the contracting officer's lack of confidence in the contractor's ability to make progress in remediating an environmental blight that the contractor admittedly caused. The contractor challenges that decision not only because the contracting officer failed to give notice of the impending default in conformity with the contract, but also because the Government's take-over contractor of choice has operated virtually *carte blanche* in attempting remediation. Ultimately, the defaulted contractor

resists paying for these costs over which it had no control. The parties agreed that the court should resolve liability as an initial matter.

## FACTS

A gasoline spill occurred at the United States Forest Service (the "Forest Service") Facility known as the Oak Knoll Work Center ("Oak Knoll" or "the work center") in the Klamath National Forest, California. On Friday, April 30, 1993, an employee from Cross Petroleum, Inc. ("plaintiff"), deposited 2,000 gallons of unleaded gasoline into a vadose monitoring well that he mistook for an underground storage tank for unleaded gasoline. The vadose monitoring well was designed to detect leaks from the underground gasoline tank, but was not constructed to contain gasoline. It is extensively perforated, and the gasoline consequently passed through the well into the subsurface. Forest Service personnel discovered the accident on Monday morning, May 3, 1993, when they noticed that the gasoline tank was empty. Dennis L. Cross, Vice President of plaintiff, testified that the Forest Service's Yreka office telephoned plaintiff's office during that day and notified plaintiff that a suspected incident had occurred at Oak Knoll on the previous Friday. Plaintiff has accepted responsibility for the spill.[1]

By Tuesday, May 4, Mr. Cross was on-site at the Oak Knoll Work Center, along with Thomas Sheridan of the environmental contractor Inter–Mountain Electric, and Jeffrey Wendt of Aegis Environmental ("Aegis"). Plaintiff had contracted with Inter–Mountain Service Station Repair (now Inter–Mountain Electric) to excavate the area under the monitoring well. Plaintiff was insured with a pollution policy through Federated Mutual Insurance Company ("Federated"), which, in turn, had arranged for Aegis to conduct other aspects of the emergency remediation. Sharon D. Koorda, a hydrologist and district hazardous materials coordinator with the

Forest Service, was also on-site the day the spill was discovered and during the ensuing month when the initial remediation effort took place. Roy R. O'Connor, an Associate Engineering Geologist at the North Coast Regional Water Quality Control Board (the "Water Board"), first visited the site on Tuesday, May 6, 1993.

Mr. Cross testified that Aegis and Mr. O'Connor decided that the tank cavity should be excavated immediately to remove and capture as much of the contamination as possible and to limit its spread to groundwater or to remote subsurface areas. The excavation began on or about Wednesday, May 4, 1993, and extended downward approximately 30 feet, where it met groundwater. At that point Aegis and the Water Board instructed the workers on-site to stop the vertical excavation. Aegis concluded that the contamination had reached the groundwater and therefore instructed that further testing of the groundwater be conducted. The excavation extended horizontally to capture the lateral migration of the gasoline plume. During the excavation Mr. Cross noticed an odor that he described as "more of a diesel-type smell." *See* Transcript of Proceedings, *Cross Petroleum, Inc. v. United States,* No. 97–251C, at 378 (Fed.Cl. Aug.12–15, 2000) (hereinafter "Tr."). Although Ms. Koorda testified that she did not notice a change in the odor as the excavation extended downward, Jay F. Mika, an Assistant Forest Engineer, who was the Facilities Engineer and Contracting Representative ("COR"), for the cleanup project, identified diesel as a contaminant based on tests of the water removed after the petroleum gas spill.

Plaintiff's personnel stockpiled some soil that was deemed not to be contaminated. The contaminated soil was removed to an area near the worksite's sewer lagoon, where it was supposed to be stored on plastic tarpaulins and covered at night. Ms. Koorda testified that on several occasions plaintiff's personnel left the dirt uncovered overnight.

---

1. Background facts also are recited in *Cross Petroleum v. United States,* 51 Fed.Cl. 549 (2002), in which the court denied plaintiff's motion for summary judgment contesting that the subject contract rendered plaintiff legally responsible for the spill. Plaintiff's actions at the time of the

spill and thereafter are consistent with a finding that plaintiff acknowledged its responsibility as a matter of fact. Plaintiff does contest the Forest Service's responsibility for the contamination resulting from the spill, as well as responsibility for other contaminants.

Plaintiff completed the excavation on or about May 20, 1993.

According to Mr. Mika, who testified by deposition, the Water Board had "ultimate control" on any remediation proposal. *See* Deposition of Jay Mika, Nov. 3, 1998, at 48. The Water Board works with responsible parties in contamination incidents to help them clean up, investigate, and review the remediation work. In this case the Water Board considered the Forest Service and plaintiff to be the responsible parties. As part of its supervisory and oversight function, the Water Board requests progress reports on site remediation, as well as proposed workplans for future action. Mr. O'Connor, in a memorandum dated May 11, 1993, indicated that he had requested a workplan from Mr. Wendt of Aegis by Monday, May 17, 1993. Aegis submitted a workplan for further remediation to the Water Board for approval on or about June 3, 1993. The Water Board conditionally approved the plan, pending certain additions.

During the excavation period, the Forest Service had been in contact with Federated, outlining its requirements for the remediation effort. Lola Capp, the Contracting Officer for the Forest Service with responsibility for performance of the subject contract, testified that, among other things, the Forest Service required that potable water be transported to the work site. The only source of water at the site had been a well, and Mr. Mika and Richard Sowa, the Forest Service Engineer and Mr. Mika's supervisor, recommended that the well not be turned on. Because the gasoline had reached groundwater, they feared the well could pull contaminated water into the Oak Knoll plumbing system if it were turned on, thus contaminating the entire network of pipes and fixtures.

The Forest Service also required that a 10–foot thick bentonite plug be installed in the excavated hole before it was backfilled in order to prevent future contamination of groundwater. A bentonite plug is a slab of clay has very low permeability and swells when it comes in contact with water. The plug is intended to provide a barrier between the groundwater and any possible future contaminants from above. Ms. Capp testified

that Mr. Mika had made that recommendation, as well. The court finds, based on Ms. Capp's testimony and the deposition of Mr. Mika admitted at trial, that her reliance on the COR with respect to the technical aspects of the remediation effort was absolute. According to defendant, one of the facts that exacerbated the fuel spill was the bedrock, which trapped the petroleum and made its recapture elusive. However, the bedrock formed a layer which Mr. Mika thought would prevent the petroleum from permeating the soil.

On May 28, 1993, Gail E. Clark, Claims Supervisor at Federated, wrote to Ms. Capp and Mr. Mika, notifying them that Federated took the position that the Forest Service shared liability for the accident. Ms. Clark's letter stated that Federated would consider paying for water to be transported to the site, but only until June 4, 1993; Federated refused to pay for the cost of hauling water after that date. Ms. Clark added: "In the event that you determine later that there is a problem in the domestic well, please forward the technical evidence that you have regarding such a problem and we will take a look at that information and let you know our position." Federated also declined to finance the cost of installing a bentonite plug at the bottom of the tank pit, as Federated did not consider it to be a reasonable or necessary expense. Finally, Federated notified the Forest Service that Aegis would prepare a workplan to drill soil borings and a monitoring well to test for contamination, and "[i]f the test results come back at acceptable levels, this will be the end of our involvement on this case." Federated confirmed that Mr. Mika and/or other employees at Oak Knoll would direct the backfilling activities to refill the hole resulting from the tank excavation.

Contracting Officer Capp responded to plaintiff and Federated in a letter dated June 3, 1993, setting forth the Forest Service's position on the matter. The Forest Service required from Federated: 1) a supply of potable water to be provided until, at a minimum, the ground water monitoring wells were in place and functional; 2) a bentonite plug to be installed prior to backfilling the excavation; 3) the soil to be tested to meet

Water Board requirements, as well as Siskiyou County Health Board requirements; 4) a new fueling station to be installed; 5) all contaminated material to be treated and removed; and 6) other requirements to be met as additional information came to light.

On June 6, 1993, Ms. Capp wrote plaintiff and Federated further acknowledging receipt of the May 28 letter. She stated the Forest Service's disagreement with Federated's statement that the Forest Service was at all responsible for the accident. "The Forest Service considers [plaintiff] solely responsible for the environmental cleanup of the petroleum contamination and all associated costs at the Forest Service's Oak Knoll ... work site." Ms. Capp took the position that the cleanup should meet all federal, state and local regulations, and insisted that the contaminated materials be treated and removed. Her letter characterized Federated's attempt to cease payment for transportation of water to Oak Knoll as unreasonable and stated that it would jeopardize the health of personnel in the area. Ms. Capp explained the Forest Service's fear that turning on the well might contaminate the entire plumbing system. Plaintiff must continue to supply potable water to the site until the new wells were installed and confirming data showed that the groundwater was not contaminated. Because it would prevent the backfilled pit from acting as a direct conduit for contaminants to reach groundwater, Ms. Capp also insisted that the installation of a bentonite plug was reasonable and necessary. She pointed out that Federated was in error when it stated that Mr. Mika would direct the backfilling. The Forest Service would inspect the work, but not direct it. Finally, she instructed that plaintiff would be required to install a new fueling station.

Federated ceased paying for the potable water deliveries as of June 4, 1993, at which time the Forest Service arranged for its delivery. It eventually took three years to dig a new well, during which time the Forest Service transported potable water to the site twice a week.

Ms. Capp again wrote plaintiff on July 2, 1993, enclosing notes from a June 28, 1993 meeting. Noting that "[i]t has been several weeks since any work has occurred on the site," she requested a schedule of proposed actions for the remainder of the cleanup within 10 days of receipt of the letter. The letter cited five specific contract provisions that Ms. Capp deemed relevant to the impasse. Ms. Capp copied Mr. Mika and Ms. Clark of Federated on the letter.

Federated wrote Ms. Capp and Mr. Mika a courtesy letter on July 8, 1993, notifying the Forest Service that Aegis had been replaced by Bonkowski & Associates ("Bonkowski"). Mr. Cross testified that plaintiff first hired Aegis to serve as its environmental consultant, but Aegis went out of business shortly after its retention by plaintiff. Plaintiff then hired Bonkowski.

Bonkowski submitted a proposed workplan to the Water Board for approval on August 3, 1993. The plan outlined remediation tasks, including sampling the soil for contamination, testing the tank excavation, backfilling the tank cavity, installing four groundwater monitor wells to protect the onsite domestic well, monitoring the groundwater monthly and quarterly for one year, aerating and disposing of the contaminated soil, and issuing a final report. In another letter dated August 6, 1993, Bonkowski wrote the Water Board, with the same workplan attached, advising that a copy of the plan had been sent to plaintiff, the Forest Service, Federated, and others and that the plan incorporated review comments from both the Forest Service and the Water Board. Bonkowski stated that work was to begin on or about August 9, 1993, and that "[t]his is contingent on Federated's review of the work." In fact, work did not begin on August 9, as Federated did not approve Bonkowski's plan.

Mr. O'Connor at the Water Board wrote plaintiff on September 3, 1993, approving the Bonkowski remediation plan and stating that the plan must be implemented and a progress report must be submitted to the Water Board by November 12, 1993. Mr. O'Connor testified that there was "[n]othing in particular about that date" that made the Water Board choose it as a deadline for the progress report, but acknowledged that weather was a consideration. Tr. at 348. The state

and federal government personnel shared a concern that the winter rains could spread the contamination further if the soil had not been disposed of by mid-November.

By early September 1993, Ms. Capp was beginning to worry that the inclement weather would exacerbate the spill's environmental impact. In the Oak Knoll region, the winter rains usually begin around mid– to late November. On September 9, 1993, Ms. Capp sent plaintiff a letter expressing concern about the remediation effort. The Forest Service had received the Bonkowski workplan on August 5, with a projected start date of August 9, pending approval by Federated. As of September 9, the Forest Service had received no further communication, and no work had taken place on the site. "Now after a month we are left with concerned uncertainty about your cleanup actions." The letter went on to request a revised plan of action, stressing that the work must be completed before the onset of inclement weather. The installation of the new fueling station was the only part of the effort that could be delayed until the following spring.

Plaintiff terminated Bonkowski on September 20, 1993, allegedly for submitting its workplan to the Water Board without first seeking approval from plaintiff. Mr. Cross testified that he was unaware that Bonkowski had submitted a workplan to the Water Board and that neither he nor Federated had reviewed the plan. He was upset to learn that Bonkowski had submitted it without his review, and it "far exceeded" the remediation tasks that he had discussed with Bonkowski. Tr. at 438. Aegis, too, had submitted its workplan to the Water Board without plaintiff's review, but Mr. Cross did not find that unacceptable because the Aegis plan coincided with the scope of work that they had discussed previously. Plaintiff viewed the Bonkowski workplan as excessive in three respects: 1) it required an elaborate plan for backfilling the excavated hole; 2) it required 4–inch monitoring wells that could later be converted to excavation wells, instead of 2–inch wells; and 3) it required an excessive amount of soil testing. Other evidence also suggests that plaintiff was discouraged by the price of the Bonkowski plan. Federat-

ed's telephone records indicate that Mr. Cross spoke with Kendall F. Person, a file handler at Federated, on September 11, 1993. In his notes from that conversation, Mr. Person wrote: "[Mr. Cross] stated he thought [the Bonkowski] estimate was twice as high as it should have been."

Mr. Cross testified that he also had not received a cost estimate from Bonkowski before the latter submitted the plan to the Water Board for approval. Bonkowski sent a cost estimate of $383,406.54 to Federated on September 8, 1993–a month after initially submitting the plan to the Water Board, and five days after its approval. On September 21, 1993, the day after its termination, Bonkowski appealed to plaintiff, asking to be retained for the job. Its letter stated: "[W]e understand that [Federated] perceives that our estimate ... exceeds the amount budgeted for backfilling the tank cavity" and suggested that the estimate might be lower-perhaps as low as $360,000.00–if certain tasks were not required. The estimate for the backfill portion of the plan totaled $155,000.00.

Federated hired Hydro Environmental Technologies, Inc. ("HETI"), on September 20, 1993, which was represented by the environmental consultant Markus B. Niebanck. Realizing that the Water Board had given plaintiff the November 12 deadline, Mr. Niebanck testified that, upon being hired by Federated, he immediately contacted Mr. O'Connor at the Water Board to discuss further action. On September 29, Mr. Niebanck approached Mr. Mika at the Forest Service to discuss backfilling the excavated area. At that point Mr. Niebanck realized that the Forest Service wanted what he described as a fairly elaborate scheme for the backfill. Mr. Mika was considering putting an underground tank back in the same excavation, and he did not want it to rest upon unconsolidated fill. He determined that a bentonite plug should fill the excavated site between the tank and the groundwater in order to seal the groundwater from water migrating to the source and thereby lower the risk of contamination should another accident occur. Mr. Niebanck considered such placement for a hazardous materials tank to be unwise,

because it was 200 feet uphill from the work-site's source of drinking water. He told Mr. Mika as much and recommended that Mr. Mika reconsider his plan.

Mr. O'Connor wrote plaintiff a letter on September 28, 1993, on which he copied Bon-kowski, reiterating the Water Board's November 12 deadline. He warned that if a plan was not implemented and a report not made by that date, "our office will issue a formal Cleanup and Abatement Order and direct the cleanup and investigation of this site."

Contracting Officer Capp did not receive a formal notification from plaintiff that Bon-kowski had been replaced by HETI, although she was aware that Mr. Niebanck and HETI personnel were in ongoing contact with Mr. Mika regarding the completion of the work. Indeed, Mr. Niebanck sent two letters to Mr. Mika in mid-October (October 15 and 18), on which Ms. Capp was copied, discussing HETI's progress on the remediation and suggesting alternatives for future work. Ms. Capp and Mr. Mika also knew that HETI was on-site, even carrying out testing that was called for under the Bonkowski work-plan.

On October 4, 1993, HETI field technician Henry Hurkmans visited the Oak Knoll site and began to carry out some of the soil testing that the Bonkowski plan called for. He tested the soil from the stockpiles and from the excavation to find out if residual contamination from the unleaded gasoline was present. The soil samples were tested for diesel constituents, as well, because an above-ground diesel tank was located just uphill from the excavation, and HETI considered it prudent to test for both. During the next week or so, Mr. Niebanck put Mr. Mika in touch with Gary Pischke, a certified Engineering Geologist and an Associate Hydroenvironmental Senior Engineer at HETI. Mr. Pischke's role was to act as the lead technical person for the backfill task.

Mr. Niebanck, along with the Federated file handler Mr. Person, met with Mr. O'Connor on October 7 to discuss modifications to the Bonkowski plan. The first issue was whether the diameter of the monitoring wells could be reduced from 4 to 2 inches. Mr.

Niebanck testified that smaller wells were cheaper to construct and could be used for soil sampling. They could not, however, later be converted for extraction use. According to Mr. Niebanck, typically wells that are installed in early stages are sited without a great deal of knowledge of the subsurface, so it makes more sense to start with small wells and make larger ones when one has a better understanding of the underlying terrain. The second issue that Messrs. Niebanck, Person, and O'Connor discussed was the manner in which the excavation should be filled. They also discussed the frequency of the soil sampling and the method in which the contaminated soil should be aerated.

Meanwhile, the Forest Service had begun discussing bringing Bonkowski back to finish the project. COR Mika's diary notes for October 6, 1993, record his having discussed with Ms. Capp an "alternative, whereby [the Forest Service] took over the project on a cost plus basis with Bonkowski." Tr. at 243. Ms. Capp admits that she did not inform plaintiff of this alternative plan. Mr. Mika then submitted a contract action request to the Forest Service, to be sent to the Washington, D.C. office for approval of a noncompetitive contract, which would put the Forest Service in a position to hire Bonkowski directly for the remediation. The request listed October 20, 1993, as the start date and estimated that the cost would be $350,000.00.

Mr. O'Connor of the Water Board testified that the main difference between the Bonkowski plan and the HETI plan was that Bonkowski had a "very elaborate plan of backfilling," and HETI had a "more straightforward ... less expensive, less technical way of backfilling the hole." Tr. at 327. Although the Water Board did not review HETI's plan formally, he believed that it would have been acceptable.

On October 14, 1993, Mr. Mika wrote Mr. Niebanck at HETI, stating that no work should be conducted on the site without the Water Board's prior approval of a workplan. The letter also allowed HETI to take soil samples to assist it in producing a plan, although the samples from the previous week (referring presumably to those samples tak-

en by Mr. Hurkmans) were deemed not acceptable. Future sampling would require chain-of-custody seals affixed to them. The letter reiterated that time was of the essence.

Some disagreement was evident over how long the Water Board would take to approve a workplan. Mr. O'Connor testified that approval could take two to four weeks. In an earlier deposition, he stated that one month for an approval is "fairly expedient" for the Water Board. Tr. at 354. Mr. Niebanck, however, testified that the Water Board could get a workplan approved within one to two days, if needed.

Mr. Niebanck responded to Mr. Mika's letter on October 15, 1993, expressing his desire to backfill the excavation as soon as possible, though suggesting an approach other than installing a 10-foot thick bentonite plug to fill the hole. He advised that Mr. Pischke would contact the Forest Service to discuss options. Submitting a workplan was contingent on Mr. Mika's reaching an agreement with Mr. Pischke. The letter also encouraged Mr. Mika to consider installing an above-ground fuel storage tank and moving hazardous materials storage areas downslope from the water well. Mr. Niebanck advised that the soil would be tested for diesel fuel compounds.

On October 21, 1993, Contracting Officer Capp issued plaintiff a "Notice of Default Termination," recounting the events of the previous months, and noting that "you have not responded to my Show Cause Letter of September 9, 1993 ...." The termination was based on Section I.28(a)(2) of Contract No. 54–91W8–3–3005, which is the local Forest Service contract ("the contract"). The relevant provision reads:

> The Government's right to terminate this contract under subdivisions (1)(ii) and (1)(iii) above, may be exercised if the Contractor does not cure such failure within 10 days (or more if authorized in writing by the Contracting Officer) after receipt of the notice from the Contracting Officer specifying the failure.

Her letter stated: "The services that are hereby being terminated will be procured from another contractor; and you will be held liable for these damage costs." The

notice advised that it constituted a partial default termination letter and that plaintiff still was liable for ongoing gasoline deliveries under the contract. Plaintiff completed the remainder of the contract without incident.

On the same date that the notice of default termination issued to Cross, Bonkowski sent COR Mika a letter proposing remedial actions at the Oak Knoll station on a firm fixed-price basis totaling $208,838.90. The work would include four tasks: cutting the slope of the tank cavity and winterizing the soil stockpiles; backfilling the tank cavity with gravel and engineered fill (though notably not with a bentonite plug); installing four monitoring wells (three shallow and one deep); and monitoring groundwater quarterly for one year. Bonkowski proposed beginning work the week of October 26 at an accelerated schedule. The tank backfilling would take approximately eight days, the drilling and well installation another six, and the laboratory testing and reporting approximately five days.

The Forest Service contracted with Bonkowski on or about November 1, 1993, under 48 C.F.R. § 6.302.2, entitled "Unusual or Compelling Urgency," which allowed the Forest Service to engage Bonkowski on a non-competitive basis. Bonkowski's subsequent contracts continued to be based on this regulation, at least through the end of Ms. Capp's tenure as contracting officer in 1996. Ms. Capp testified that such a contractual relationship could be justified if a contractor had specific knowledge of the site and if it were more cost effective to work with an existing contractor rather than to establish ties with a new one. The Forest Service did not consider any provider of these services other than Bonkowski. Thereafter, subsequent funding for additional Bonkowski projects was approved through a series of purchase orders.

In the years following the default termination, Bonkowski undertook many activities at the site-drilling several additional groundwater monitoring wells around the site of the spill (seven total), taking periodic samples from the monitoring wells for testing, taking soil borings, drilling a new domestic water

well for the work center, and constructing a dual vapor-and-groundwater extraction well system in 1996 to clean the groundwater and control the migration of contaminated water. After 1996 Bonkowski's activities consisted chiefly of operating and monitoring the system and taking periodic samples from the monitoring wells. Several samples detected gasoline constituents. Some indicated the presence of hydrocarbons with a diesel pattern.

Plaintiff had no control over the remediation effort at Oak Knoll after October 21, 1993. The Forest Service wrote plaintiff on November 15, 1994, itemizing costs for the emergency work completed at that time, which totaled $420,648.72, and cautioning plaintiff not to consider that amount to be the final cost of cleanup. The Forest Service took the position that it was necessary to re-install the fueling station and queried whether plaintiff would complete that work and any remaining work that the Water Board would require. If no response was received by December 15, 1994, the Forest Service would assume that plaintiff did not intend to perform the work, although plaintiff still would be responsible for all costs associated with the work.

In January 1995 the Forest Service, plaintiff, Federated, and HETI met in Yreka, California, to discuss the November 1994 letter. Mr. Niebanck testified that, in addition to himself, those in attendance included Mr. Person; Chad Schwartz, who was an attorney for plaintiff at the time; Roger Rogers, an engineer at the Forest Service; and other Forest Service personnel. The parties did not come to any new agreement about the situation at that meeting.

According to Mr. Niebanck; the same parties met again in May 1995 in San Francisco. Plaintiff was not offered another chance to take over the cleanup effort at that time, although plaintiff requested cost estimates for the project and competitive bidding for the work. Mr. Niebanck testified that the Forest Service agreed that it would open the project to competitive bids and provide plaintiff with cost estimates. In fact, it has not done so. As of August 2002, Bonkowski was still submitting work proposals to the Water Board for the Oak Knoll site. Most recently, on August 5, 2002, Bonkowski filed another workplan dated June 4, 2002, with the Water Board. The plan contained a proposal for installing a hydraulic control system, but did not include a cost estimate.

The Forest Service issued a Final Decision, dated April 8, 1996, assessing plaintiff $705,657.82 for the cost of the cleanup. The Final Decision cited clause C–2.1 as the grounds for its decision. That clause provides, in relevant part:

> The Contractor shall use reasonable care to avoid damaging or contaminating existing buildings, equipment, asphalt pavement, soil or vegetation (such as trees, shrubs, and grass) on the Government installation. If the Contractor fails to use reasonable care and damages or contaminates any such buildings, equipment, asphalt pavement, soil or vegetation, or other Government facilities, the Contractor shall replace the damaged items or repair the damage at no expense to the Government and to the satisfaction of the Government. Further, if as a result of failure of the Contractor to comply with the requirements of this contract, Government buildings, equipment, asphalt pavement, soil or vegetation or other Government facilities become damaged or destroyed, the Contractor shall replace or repair the damage at no expense to the Government, and to the satisfaction of the Government. Should the Contractor fail or refuse to make such repairs or replacements, the Government may have the repairs or replacement accomplished, and the Contractor shall be liable for the cost thereof . . . . In the event the Contractor spills any oil (including, but not limited to, gasoline, diesel fuel, fuel oil, or jet fuel), the Contractor shall be responsible for the containment, cleanup, and disposal of the oil spilled. Should the Contractor fail or refuse to take the appropriate containment, clean up and disposal actions, the Government may do so itself. The Contractor shall reimburse the Government for all expenses incurred including fines levied by federal, state or local governments.

As of December 31, 1996, the Forest Service had expended approximately $1,022,212.49 for remediation, and the additional future costs estimated and claimed by the Forest Service bring the total to $1,180,114.31.

Plaintiff filed suit on April 7, 1997 claiming, *inter alia*, that the Forest Service breached the contract by failing to provide plaintiff with a 10–day cure notice as prescribed by the contract and that plaintiff is liable only for expenses which are necessary, reasonable, and warranted under the circumstances. The complaint estimated that these expenses should have totaled approximately $400,000.00 to $500,000.00.

## DISCUSSION

The contract requires the Government to give a 10–day notice of default specifying the default or failure to perform under the contract and affording plaintiff an opportunity to cure the default or failure to perform within the 10–day period. Thus, the contracting officer must provide plaintiff with a cure notice-a letter in the form of a notice specifying plaintiff's failure under the contract-and then allow plaintiff 10 days to cure.

### 1. *Anticipatory repudiation*

■ Defendant argues that a cure notice was not required because plaintiff already had anticipatorily repudiated the contract. Plaintiff responds that anticipatory repudiation is an affirmative defense that was waived when defendant failed to include it in its original answer. Plaintiff contends that RCFC 8(c) provides for such a waiver.

Rule 8(c) states that affirmative defenses and "any other matter constituting an avoidance" must be pled in the answer. The rule lists a number of affirmative defenses, but does not include anticipatory repudiation. At the same time, the catch-all phrase quoted above indicates that the list is not meant to be exhaustive.

Plaintiff has not established that anticipatory repudiation is an affirmative defense. None of the three cases plaintiff cites-*Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 960 (5th Cir.1999); *McClaran v. Plastic Indus., Inc.*, 97 F.3d 347, 355 (9th Cir.1996); and *Panasonic Co. v. Zinn*, 903 F.2d 1039, 1041 (5th Cir.1990)-deals with the issue of anticipatory breach as an affirmative defense or the circumstances under which the defense can be waived. Each case merely recites as part of the procedural history that the defendant raised anticipatory breach as an affirmative defense in its answer. The fact that at least three defendants in federal courts have raised anticipatory breach as an affirmative defense does not establish that it necessarily must be pled in the answer or be waived.

Defendant cites *Danzig v. AEC Corp.*, 224 F.3d 1333, 1339–40 (Fed.Cir.2000), to support a breach by anticipatory repudiation. The Federal Circuit held that the Navy was entitled to regard the contractor's failure to provide assurances of timely performance as a breach justifying termination of the contract for default. "The law applicable to a contractor's failure to provide assurances of timely completion is a branch of the law of anticipatory repudiation .... At common law, anticipatory repudiation of a contract required an unambiguous and unequivocal statement that the obligor would not or could not perform the contract." 224 F.3d at 1337 (internal citations omitted). However, the court noted that modern decisions do not limit anticipatory repudiation to cases of express and unequivocal repudiation of a contract. *See* Restatement (Second) of Contracts § 251(1) (1981); *Danzig*, 224 F.3d at 1337. "Instead, anticipatory repudiation includes cases in which reasonable grounds support the obligee's belief that the obligor will breach the contract. In that setting, the obligee 'may demand adequate assurance of due performance' and if the obligor does not give such assurances, the obligee may treat the failure to do so as a repudiation of the contract." *Id.* at 1337–38 (*quoting* Restatement (Second) of Contracts § 251(1)). The Federal Circuit concluded that the contractor in *Danzig* had failed to provide adequate assurances and consequently had repudiated the contract.

■ The case at bar differs from *Danzig* in one important respect: An explicit contract provision addresses the situation where the Government requests assurances and ter-

minates the contract based on that request. No such contract provision was present in *Danzig*. The two provisions-the Restatement and the contract-both govern the same set of facts; both are intended to deal with a situation in which the Government requests assurances and the contractor fails to provide such assurances. Given that both provisions apply to the same type of impasse, defendant has failed to justify applying the Restatement rather than the specific rule set out by the mutually agreed-upon contract that the parties signed *ex ante*. It should be noted the Restatement appears to hold the Government to a lower standard, requiring merely a vague "demand" for adequate assurance, whereas the contract provision requires a formal cure notice that allows a 10–day period for cure. Defendant has failed to displace the explicit contract provision governing a request for assurances and termination of the contract on the basis of that request.

### 2. *Cure notice*

■ In the alternative, defendant argues that Contracting Officer Capp's September 9, 1993 letter to plaintiff and Federated constituted a valid cure notice and that, because plaintiff failed to respond, the Forest Service lawfully terminated plaintiff for default.

The contract allows for a default termination to follow a cure notice, without more. Thus, the cure notice portends negative consequences. Default termination is a "drastic sanction" and "should be imposed (or sustained) only for good grounds and on solid evidence." *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed.Cir.1987).

Defendant trumpets Ms. Capp's September 9, 1993 letter as the required "cure notice," but it falls far short of the cure notice required under the contract. The letter vaguely complains that the Forest Service suffers from "concerned uncertainty" about plaintiff's cleanup actions, and it requests a timeline of proposed action. However, this letter fails to give plaintiff a specific deadline for remediation or a 10–day cure period. During her testimony Ms. Capp strained to give the wording of her letter the requisites of a cure notice, but she could not do so. In fact, the court gleaned the impression that this modest, cautious witness was pressed into service beyond her capabilities; her efforts on the stand to sustain her September 9 letter as a cure notice were unpersuasive.

Ms. Capp testified that she intended her letter to prompt plaintiff to communicate with the Forest Service about its timeline for the project. During her deposition Ms. Capp was asked if, in writing the September 9 letter, she was attempting to provide plaintiff with the type of notice that would allow the Forest Service to terminate, at least in part, the performance of plaintiff in the event of a default. She replied: "No. I was attempting to get a schedule and find out what they had planned and how far off their plan they were." Tr. at 235–36. Her candor also was evident during her testimony at trial:

Q: What were you conveying, specifically, when you indicated [your] concerned uncertainty in terms of your demands and expectations of Cross?

A: I was trying to find out from Cross what their plans were; how they were going to proceed with the work; when they expected to have someone on site; when they expected to complete the work. I wanted some conversation with them or some indication of what their plan was and how they were going to proceed and finish the job.

Q: Did you run this letter by Legal before you sent it?

A: Yes, I did.

Tr. at 175. Later, Ms. Capp was asked whether she viewed this letter as a show cause letter or a cure notice, and she responded that it was a "show cause notice." Tr. at 178. She admitted that she did not follow up on her September 9 letter to give plaintiff notice that it could be defaulted under the contract if it failed to act as the letter directed. In her deposition Ms. Capp testified to a conversation with either Dennis Cross or his brother, Jim Cross, President of plaintiff, subsequent to the September 9 letter. She remembers asking only whether plaintiff was going to respond to the letter, but did not emphasize its import or urgency.

Ms. Capp's September 9 letter stands in stark contrast to her earlier July 2, 1993

letter, which also requests a progress schedule of proposed action, but which establishes a specific deadline for plaintiff's action (10 days). The letter also cites five specific contract provisions that the Forest Service deemed pertinent to the case. The "cure notice" of September 9 asked for the same action (a progress report), but did not provide a deadline and did not cite specifically any contract provision. Having received such a detailed letter in the past from the Forest Service, complete with cited contract provisions and a firm deadline, plaintiff had no reason to regard the September 9 letter as a formal cure notice, nor did plaintiff's prior dealings with the Forest Service gave it reason to believe that the vague letter lacking a firm deadline could constitute notice that would lead to a default termination.

Most significantly, neither plaintiff nor defendant treated the letter as a cure notice. The Forest Service did not terminate the contract 10 days after the letter, but waited until late October, more than a month. Far from intending the letter as a final warning, the lapse in time indicates that the Forest Service treated the letter as a continuation of its drawn-out attempt to get current information from plaintiff. While plaintiff can be faulted for not communicating as frequently as was warranted under the circumstances, the lack of communication could constitute grounds for termination only if plaintiff was notified by a valid cure notice.

Plaintiff's reaction to the September 9 letter is also telling. Plaintiff did not respond to the letter, let alone try to cure the defect, beyond its normal efforts to secure an environmental contractor for the site. Far from indicating total disregard for the alleged notice, plaintiff's actions are more consistent with treating the letter as an expression of concern and frustration, but not a cure notice. Plaintiff previously had responded when given a firm deadline. After plaintiff fired Bonkowski, Mr. O'Connor at the Water Board wrote plaintiff a stern letter on September 28, 1993, reiterating the November 12 deadline for implementing the plan. Upon receiving Mr. O'Connor's letter, plaintiff forwarded it to Federated with a note stating: "Looks as though we have received

our marching orders." Mr. Cross testified that he was trying to impress on Federated that it must move on the plan. By that time plaintiff already had hired HETI and had begun working on a new remediation plan. Mr. O'Connor met with HETI's geologist Mr. Niebanck as early as October 7, 1993. HETI field technician Mr. Hurkmans was on-site during the first week of October conducting soil samples. Plaintiff's response to the Water Board letter indicates that plaintiff was not only working to remedy the situation, but also was responsive to announced deadlines. The evidence further indicates that plaintiff was not so brazen as to disregard communication from the Forest Service, let alone a letter purporting to warn that its contract would be terminated for default.

Ms. Capp testified that she placed primary reliance on the November 12 deadline set by the Water Board and that it was her understanding that the Water Board would take over the remediation effort if a workplan had not been initiated by that deadline. She and Mr. Mika decided that October 21, 1993, was the date by which a workplan must be implemented if it were to be completed by November 12, thus justifying terminating Cross on that date. She admitted that she did not convey the urgency of the November 12 date to plaintiff, or the October 21 date on which she and Mr. Mika placed so much importance. COR Mika was emphatic that the "trigger" for terminating plaintiff was time. Mika Dep. at 55. He had no objection to plaintiff's approach to the backfill, but he did believe that the consultant was running out of time to fill the hole before the rainy season commenced.

Mr. Mika was in contact with HETI during the first three weeks of October while working with Bonkowski to take over the remediation. As far as Mr. Mika was concerned, Bonkowski at this point was a backup if HETI failed to present an acceptable proposal and begin to implement it. As of October 18, 1993, COR Mika and Contracting Officer Capp had obtained approval to contract with Bonkowski.

Mr. Cross testified that plaintiff was aware of the November 12 deadline, having received direct communications from the Water

Board on September 3 and September 28 of that year. Mr. Cross viewed the deadline as a date by which plaintiff must put a plan into action. He testified:

Q: So you recognized that November 12th date as . . . a date certain to complete the project?

A: No. Not a date certain to complete the project.

Q: So what then were the marching orders? What were they ordering you to do?

A: Just that we'd better move ahead faster . . . [cut off].

Tr. at 428. The Water Board also did not view its own deadline as a hard date on which work had to be completed. Contrary to Ms. Capp's understanding, Mr. O'Connor testified that the November 12 deadline was intended to guide the parties, rather than to serve as a drop-dead date; in fact, as a matter of practice, the Water Board does not take over cleanups. As a sanction for missing a deadline, the Water Board generally writes a Cleanup and Abatement Order, which would establish tighter timeframes and provide for stiffer penalties in missing the deadlines. According to Mr. O'Connor, it is common to extend such deadlines, and the primary consideration for such an extension would be whether work on the site was progressing. He confirmed that in October 1993 HETI was proceeding timely with its plan. Although the winter season was a consideration, and the Water Board was more likely to extend a deadline if a workplan had been approved, the Water Board considered the actual field work more important than the paperwork. Indeed, Bonkowski itself, after replacing HETI on the site, submitted its status report to the Water Board on February 15, 1994, well past the November deadline. Thus, even apart from the facial defects in the September 9, 1993 letter itself, the surrounding circumstances could not support the finding that plaintiff received information amounting to a *de facto* cure notice.

### 3. *Damages*

◼ Defendant seeks recovery of the cleanup costs that the Forest Service incurred under section C–2.1 of the contract, which states that the contractor "shall reimburse the Government for all expenses incurred[.]"

Because the Government improperly terminated the contract, plaintiff argues that the default should be treated as a default for the Government's convenience, under section I.28(g) of the contract, which provides:

If, after termination, it is determined that the Contractor was not in default, or that the default was excusable, the rights and obligations of the parties shall be the same as if the termination had been issued for the convenience of the Government.

In short, plaintiff seeks absolution for all costs of the cleanup. The cases upon which plaintiff relies—*SIPCO Serv. & Marine, Inc. v. United States,* 41 Fed.Cl. 196 (1998); *SMS Data Prod. Group, Inc. v. United States,* 17 Cl.Ct. 1 (1989); and *Sun Cal Inc., v. United States,* 21 Cl.Ct. 31 (1990)—deal with situations where the Government procured goods or services from a contractor in return for payment, and the Government wrongfully terminated the contract, *i.e.,* the default on the contract was prompted by a failure regarding the primary *res* of the contract (delivery of goods or services), not with any ancillary obligation under the contract (such as a duty to remediate).

Defendant construes termination for convenience principles, found in 48 C.F.R. pt. 49, as applying to contracts whereby the Government procures goods or services from a contractor in return for payment, so that in the event of a wrongful termination the contractor should be made whole for what it has put into the contract. Defendant is correct that the contract itself remained in full force; plaintiff continued to deliver fuel to the Forest Service under the contract. Under the traditional termination principles urged by plaintiff, the contract remedy would be payment by the Government for the cost of remediation incurred to date. However, the appropriate remedy for wrongful termination of the contract with regard to the gasoline spill cleanup, viewed as a collateral obligation under the delivery contract, might not be relief from the costs of remediation. The traditional paradigm makes little sense in the case at bar when plaintiff admits liability for

the gasoline spill, but the parties dispute the extent of that liability. The question, thus, is not whether the Government should pay plaintiff for the remediation that plaintiff performed, but, rather, to what extent plaintiff should reimburse the Government for the cleanup cost of a gasoline spill for which it was responsible.

In seeking recovery of the cleanup costs that the Forest Service incurred, defendant concedes that there may be implicit limitations on the incurred expenses that it may demand of plaintiff. As an alternative approach, defendant offers the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601–75 (2002) ("CERCLA"), as a useful model. CERCLA provides that parties responsible for a contamination are liable for the costs of cleanup expended by the Government, state, or Indian tribe, insofar as the costs are not "inconsistent with the national contingency plan," which is designed to ensure cost-effective cleanup plans. *See* 42 U.S.C. § 9607(a)(1)-(4)(A); 40 C.F.R. § 300.1. If the Government, state, or Indian tribe establishes in litigation that it incurred response costs to remedy a release or threatened release of hazardous substances and that defendants are the responsible parties, then defendants have the burden of proving that the costs incurred were inconsistent with the national contingency plan, an issue that is judicially reviewed under the arbitrary and capricious standard of review for agency action. *See* 42 U.S.C. § 9613(j)(2).[2]

Defendant finds *State of Minnesota v. Kalman W. Abrams Metals, Inc.,* 155 F.3d 1019, 1025–26 (8th Cir.1998), instructive. Defendants sought to be excused from liability for the cost of an environmental cleanup when the State of Minnesota, in violation of CERCLA, had failed to afford them a formal opportunity to comment on or undertake the cleanup activities at their own expense. The Eighth Circuit rejected this argument, refusing to wipe the slate clean for the costly cleanup because "the environmental constable blundered." *Id.* at 1026. At the same time, the court noted that "the kind of arbitrary and wasteful agency action that occurred in this case cannot be rewarded." *Id.* The court went on to hold that the state could not recover cleanup costs incurred to the extent that plaintiff could prove they would have and could have accomplished the cleanup more cost effectively. *Id.* Defendant has conceded that it would accept this formulation of the parties' respective burdens in the case at bar.

The facts in *Kalman W. Abrams* are analogous to the case at hand. Both cases deal with a situation that the traditional remedy does not address. The responsible parties in both cases were precluded from meeting their obligations under the contract and object to the costly manner in which that obligation ultimately was discharged by others. The Government entities in both cases persuasively argue that technical defects in the process by which a cleanup is conducted should not absolve a liable party of the entire cost of remediation.

Plaintiff objects to being held responsible for nine years (and counting) of remediation over which it exercised no control. At the same time, while wrongful, the Forest Service's termination of the contract for default does not absolve plaintiff of its cleanup obligations under the contract. Therefore, both parties must discharge a burden of proof when the trial for damages convenes: Defendant must justify its costs, and plaintiff must show that they were not reasonable, *i.e.,* that the cleanup could have been accomplished more cost effectively.

Defendant submits that Water Board-approved remediation actions are presumptively reasonable. The court rejects this position. Although the Water Board governs environmental cleanups, its approval signifies that a cleanup program meets environmental standards, but does not necessarily indicate that the most cost-effective means are being used in the cleanup. Mr. O'Connor testified that the Water Board rarely sees costs. Indeed, even the Bonkowski proposal was submitted to the Water Board without an esti-

---

2. This standard does not apply in the Court of Federal Claims where the court is not reviewing any aspect of the national contingency plan.

mate of how much it would cost. Mr. O'Connor explained that he questions the cost only if a plan looks like it provides for much more work than is needed under the state's environmental regulations—for example, if it proposes doing twice as much work.

Because the Water Board does not see the cost of most plans, its approval addresses the adequacy of the plan in terms of its environmental effects, not its cost effectiveness. The evidence suggests that Water Board approval is intended to protect environmental standards, while cost considerations largely are left to the parties to negotiate privately. Where, as here, one party has control over a remediation while another is liable for its cost, Water Board approval cannot provide the necessary imprimatur such that plaintiff is required to pay no matter what costs have been generated.

### 4. Jurisdiction

In Plaintiff's Status Report on filed September 13, 2002, plaintiff questioned whether the United States Court of Federal Claims-as opposed to the federal district court[3]—can, or should, retain jurisdiction over the damages phase of the trial. The court has jurisdiction under the Tucker Act, 28 U.S.C. § 1491(a)(1) (2002), insofar as this case involves the wrongful termination of a contract for which damages are sought. Jurisdiction is not lacking because the traditional remedy fails in this case and the court would apply a measure of damages that a district court applied in a CERCLA action.[4] However, if either party questions the power of the Court of Federal Claims to proceed, an appropriate motion should be filed forthwith.

### CONCLUSION

Accordingly, based on the foregoing,

**IT IS ORDERED**, as follows:

1. The court finds and concludes that the Forest Service wrongfully terminated plaintiff's cleanup efforts on the contract.

2. Plaintiff remains liable under the contract for the reasonable costs of remediation.

3. Defendant bears the initial burden of justifying its expenditures with regard to remediation. Upon such a showing, the burden of proof shifts to the plaintiff to show that the costs were unreasonable, *i.e.*, that plaintiff could have accomplished the cleanup more cost effectively.

4. Further to the order entered on September 25, 2002, a status conference shall be held at 2:30 p.m. on Thursday, December 12, 2002, to schedule all pretrial proceedings and the pretrial conference. Plaintiff may participate by telephone conference call to be placed by the court.

5. . Trial on damages, not to exceed five days, shall resume at 10:00 a.m. on Monday, February 24, 2003, in San Francisco, California, at a place to be announced by further order.

3. The parties are litigating an action pending in California district court. *United States v. Cross Petroleum, Inc.,* No. CIV S–99–0664 LKK/GGH (E.D. Ca., filed Apr. 6, 1999.) This is an action brought by the Government for breach of contract and trespass seeking damages and cleanup costs associated with the April 30, 1993 gasoline spill.

4. In determining damages, the court is not applying CERCLA, which imposes a burden on the responsible party to substantiate a challenge to

the remediation costs assessed. Rather, the court is determining damages in a contract action as to which the Government has the burden of proof in justifying costs that it incurred and seeks to pass on to the responsible party. Should the parties agree that they will resolve damages as part of the district court proceeding, the court will enter judgment for plaintiff on liability for wrongful contract termination and remit the parties to their preferred forum for further proceedings.